**UNITED STATES of America**

v.

**John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.**

**Crim. No. 91–178.**

United States District Court,
W.D. Pennsylvania.

July 11, 1994.

Frederick W. Thieman, U.S. Atty., James R. Wilson, Asst. U.S. Atty., for W.D. Pennsylvania, William D. Braun, Crim. Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court is Defendant Sheila F. Smith's Motion to Suppress [Warrant No. 91–263M]. The motion of Defendant Sheila F. Smith ("Sheila Smith") relates to the September 20, 1991 search of her residence.

### A. Findings of Fact

1. On September 19, 1991, FBI Agent Andrea Dammann presented to United States Magistrate Judge Ila Jeanne Sensenich an application and affidavit of probable cause for a search warrant for the premises located at 1352 Pesavento Drive, Bridgeville, Pennsylvania (the "Pesavento Drive affidavit") (Document No. 914).[1] The premises to be searched were Sheila Smith's residence.

2. The search warrant described the structure to be searched and authorized the seizure of the following items:

---

1. This warrant bears the designation 91–263–m. On June 20, 1994, this Court ordered this warrant unsealed and incorporated in the record of this action. *See* Document No. 913.

(a) Any and all monies realized from the operation of the video poker machines and any and all containers for said coins and currency.

(b) Any and all gambling paraphernalia and records including but not limited to: names and addresses of the owners, users, routemen, collectors, movers, solicitors, salespersons, servicemen, distributors, and manufacturers relating to the video poker machines; contracts setting forth agreements between vendors and the establishment for video poker machines; documents, ledgers, books regarding the machine usage, number of plays, amounts deposited in the machines, amounts of payoffs to winners, percentage and income earned by vendor and establishment from video poker machines.

(c) Any and all business records reflecting banking transactions, canceled checks, purchase and sales orders, invoices, shipping and receiving receipts; and invoices relating to Sheila Smith, Sheila Kelly, Duffy Conley, Duffy's Vending, Three Rivers Coin, Matrix, Premier Enterprises, T. D. Amusements, Chartiers Vending and S & M Vending from 1986 to the present.

(d) Any and all documents relating to loans and/or other financial transactions between vendor and establishment.

(e) Electronic data processing and storage devices, computers and computer systems including central processing units; internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices or other memory storage devices; peripheral input/output devices such as keyboards, printers, video display monitors, optical readers, and related communications devices such as modems; together with system documentation, operating logs and documentation, software and instruction manuals.

All of the above records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic address books", calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records.

All of which constitute fruits, instrumentalities and evidence of the offense of operating an illegal gambling business, in violation of Title 18, United States Code, Sections 2 and 1955.

Warrant, at 1–2.

3. In the affidavit of probable cause, Agent Dammann states the following regarding her sources of information:

2. I am knowledgeable of the facts set forth herein as a result of my involvement in the Duffy Conley investigation, including my interviews of witnesses; discussions with other special agents of the FBI and IRS; review of statements given by witnesses to other law enforcement officers in this investigation; review of grand jury transcripts and memoranda of interviews of several witnesses; review of documents gathered during the course of this investigation; and my own observations and surveillance during the course of this investigation.

4. The Pesavento Drive affidavit quotes 18 U.S.C. § 1955, the prohibition of illegal gambling businesses.

5. Stating that it was a description of an illegal *per se* video poker machine under Pennsylvania law, the Pesavento Drive affidavit included the following quote from *United States v. 294 Various Gambling Devices,* 718 F.Supp. 1236 (W.D.Pa.1989) (Weber, J.):

The machine displays the time honored ranking of poker hands and the number of points the machine will award for the listed hands. The ranking of hands is grounded in laws of statistical probability, and the video poker machine awards points based on this scale, although it does not award true odds. The higher rank of the hand, the higher the amount of points awarded.

Upon insertion of a quarter, the machine displays five cards on a video screen. These five cards are randomly selected by the machine from an ordinary deck of 52 cards in four suits. In an effort to improve the hand dealt to him, the player may then "discard" any of the five original

cards by pressing the appropriate buttons on the machine. The machine then displays new cards to replace the ones discarded. The machine automatically evaluates this final array of five cards, ranks it as a poker hand, and awards points as indicated above.

This in all its simplicity is the sum total of the game of video poker.

Up to now we have employed the term "points" to describe the units awarded to the player by the machine for winning poker hands. No matter whether an individual machine labels it "score," credits, or "games," each point entitles the player to one free play of the machine. Each play of the game has one object: the accumulation of additional free games, and these free games may be accumulated from game to game so that, with a run of luck, a player may accumulate a significant number of free games.

When a machine is used as a gambling device, these free games are converted to cash by a bartender or owner of the establishment that houses the machine. A successful player in such an establishment is paid a quarter for each "credit" accumulated on the machine. The bartender or owner, having verified the number of credits and paid the player, then removes or "knocks off" the player's accumulated credits, returning the machine to zero credits to await the next player's coins.

Pesavento Drive affidavit, at 3–4, ¶ 6.

6. The Pesavento Drive affidavit indicates that a Cooperating Witness ("C.W.") was granted immunity on April 24, 1991, has provided information to law enforcement officers and prosecutors approximately five times since April 9, 1991 and has testified before the federal grand jury in this case. The Pesavento Drive affidavit indicates that C.W. was represented by counsel at each of his meetings with government representatives.

7. The Pesavento Drive affidavit states that C.W. has known Duffy Conley and worked for his business from November, 1986 until the (then) present time, C.W. has no criminal record and the information provided by C.W. in this case has proven to be truthful and accurate in every instance where the FBI and IRS attempted to verify it.

8. Paragraph 4(a)–(p) of the Pesavento Drive affidavit details the information C.W. furnished to law enforcement officials and prosecutors. Paragraphs 9 through 16 of this Opinion correspond to paragraph 4(a)–(p) of the Pesavento Drive affidavit.

9. C.W. was hired in November, 1986 by Duffy Conley and Duffy's Vending, also known as Three Rivers Coin, which at that time was located at Third Avenue and Third Street, Carnegie, Pennsylvania and at Conley Motor Freight, 930 Saw Mill Run Boulevard, Pittsburgh, Pennsylvania.

10. After his first month of employment, C.W. began repairing video poker machines owned by Duffy's Vending, which were in place at various business establishments and private clubs in the Western District of Pennsylvania. These machines were operationally equivalent to the illegal machines described in *294 Various Gambling Devices.* Although there were "on paper" changes to the structure of Duffy Conley's illegal gambling business, C.W. continues to work for Duffy in substantially the same capacity at the present time.

11. From November 1986 to January 1990 Duffy Conley's video poker machine business operated as follows:

Duffy Conley was the owner and operator of Duffy's Vending. Duffy's Vending owned both legitimate vending machines and games as well as video poker machines throughout the Western District of Pennsylvania. During that time period, C.W. observed Duffy Conley acting as collector, emptying money from the video poker machines at certain locations. C.W. also observed Duffy Conley splitting money with the owners of several of the locations where the video poker machines were located. Duffy Conley's role in this organization was also made clear to C.W. when C.W. attended and participated in several business meetings of the employees of Duffy's Vending in 1988. In fact, at one of these meetings, an organization chart was provided to the employees in attendance. In addition to Duffy Conley, the management of Duffy's Vending from November

of 1986 to January of 1990 consisted of Bill Curtin, who was in charge of "tech" people (repairmen) and movers; Sheila Smith, who was in charge of bookkeeping and dispatching service calls; and Michelle Farer, who was is charge of the collectors. Pesavento Drive affidavit, 6–7, ¶ 4(c)

12. In addition to C.W., four Tech people and three movers worked out of the Third Avenue and Third Street address, responding to service requests relayed to them by Sheila Smith, a.k.a. Sheila Kelly, and John Francis "Jack" Conley. Sheila Smith and Jack Conley relayed these service calls from the Conley Motor Freight premises.

13. In the summer of 1988 the tech people and movers relocated their base of operations from the Third Avenue location to a building located at 3105 Windgap Avenue, Ingram, Pennsylvania, in order to accommodate the approximate doubling of locations in which Duffy's Vending had video poker machines, from 150 in 1986 to about 300 in 1988.

14. Throughout this time-period, employees of Duffy's Vending received wages by paycheck. C.W. was also reimbursed in cash for expenses, and, in addition, C.W. and certain other employees received a weekly bonus based upon performance. This bonus was paid in small bills in a sealed envelope, and unlike the paycheck, never had taxes deducted from it by Duffy's Vending.

15. In December, 1989, the Windgap Avenue location was raided by federal agents and U.S. Marshals. Approximately two weeks later, Duffy Conley began to reorganize his video poker machine business. Four new companies were created—Matrix, Chartiers Vending, T.D. Amusements, and S & M Vending. They were still operating at the time of the Pesavento Drive affidavit.

16. Subparagraphs 4(h–p) of the Pesavento Drive affidavit details the reorganization and subsequent operation of the gambling business:

(h) The reorganization began as follows: In approximately January, 1990, Duffy Conley asked C.W. if C.W. would be interested in forming and operating a service company which would do service work for three vending companies. This new company would be formed with financial support and at the direction of Duffy Conley. After C.W. informed Duffy Conley that he would be interested in such a proposition, Duffy Conley told C.W. to choose two tech people to work for him. Duffy Conley further instructed C.W. to get a tax I.D. number for this new business. Duffy Conley provided money to C.W. to open a bank account for the business, provided a building in C.W.'s name to be used as the location for the business, and provided C.W. with start up money. Duffy Conley and C.W. agreed that the new company would be named "Matrix". A fictitious name registration was accomplished for Matrix and C.W. was registered as the owner and operator of Matrix. The building which was provided by Duffy Conley for Matrix was located at 324 Helen Street, McKees Rocks. This building had been owned by Duffy Conley but was placed in C.W.'s name for use by Matrix.

(i) Matrix was to service three vending companies exclusively. C.W. later learned that these three vending companies— Chartiers Vending, T.D. Amusements, and S & M Vending—were recently formed businesses in the names of Rick Reed, Tom Ciocco and Phillip M. "Mike" Ferrell, respectively. Reed, Ciocco, and Ferrell, like C.W., had merely been employees of Duffy's Vending prior to January of 1990. Specifically, Ciocco and Ferrell had been collectors for Duffy's Vending, Reed had been a mover, and C.W. had been a tech person. However, through the funding and instruction of Duffy Conley, these three individuals, along with C.W., were now the owners of new businesses.

(j) After Rick Reed, Tom Ciocco and Mike Ferrell were registered as the owners of the three businesses named above, the owners of the various video poker machine locations were led to believe that the video poker machines were owned by those companies and not Duffy's Vending or Three Rivers Coin. As of January of 1990, Duffy Conley wanted it to appear that he was connected only with "legitimate" (not video poker) vending machines and games. Despite the creation of the three new

904

vending companies and the apparent "transfer" of control and/or ownership of the video poker machines, Duffy Conley to this date remains in charge of an ever-expanding network of video poker machine locations, including those that appear to be owned by the newly created vending companies, just as he remains in charge of Matrix's maintenance of those machines. The reorganization was merely a paper transaction, with all of the persons involved still performing essentially the same duties as they did prior to the creation of those businesses in January of 1990. The purpose of the reorganization was simply an attempt to remove Duffy Conley's name from the video poker machine business. Since the reorganization, the gambling operation involving the video poker machines operates as follows:

(1) The video poker machines were divided among Chartiers Vending, T.D. Amusements and S & M Vending. These three companies, through Reed, Ciocco and Ferrell, collect proceeds from their video poker machines at the various locations, just as they did when they were formal employees of Duffy's Vending. All three of these companies pay Matrix a monthly retainer as directed by Duffy Conley to cover Matrix's expenses in accomplishing the repairs of the video poker machines at the locations. Reed, Ciocco and Ferrell received Matrix business cards to distribute at the various locations so that when those locations experience problems with their video poker machines, they could call Matrix directly. After collecting money from the various locations, Chartiers Vending, T.D. Amusements and S & M Vending dispose of the money in accordance with Sheila Smith's directions. The sole purpose of Chartiers Vending, T.D. Amusements and S & M Vending is to maintain a network of video poker machines and collect the proceeds thereof for Duffy Conley.

(2) Matrix began operating on January 15, 1990, and for the first two weeks, Matrix serviced both the video poker machines for the three companies as well as the legitimate vending machines and games owned by Duffy's Vending/Three Rivers Coin. From February 1, 1990 up to and including the present, however, Matrix services only video poker machines, primarily those of Chartiers Vending, T.D. Amusements and S & M Vending. These machines are used as illegal gambling devices as described by the late Judge Weber. Matrix no longer has anything to do with the legitimate vending machines and games owned by Three Rivers Coin. This separation of service was done at the direction of Duffy Conley and Bill Curtin. As a result of this separation, when a location is experiencing problems with both a legitimate vending game and a video poker machine, a tech person employed by Duffy's Vending/Three Rivers Coin will go to that location to service the legitimate machine and a Matrix tech person will go to service the video poker machine.

(3) Matrix has nine employees, including C.W. These employees' paychecks are drawn on the Matrix bank account which was opened when Matrix was formed. Matrix receives $4,000 per month from Chartiers Vending; $5,000 per month from T.D. Amusements; $4,000 per month from S & M; and approximately $1,100 per month from two other individuals who operate video poker machines not in the name of either Chartiers Vending, T.D. Amusements or S & M Vending. These amounts are not related to the number of services performed by Matrix on the video poker machines. Rather, Duffy Conley determines how much is to be paid by these five sources to Matrix, and this is the only source of income for Matrix. Matrix exists only to service video poker machines and does not attempt to make a profit but rather uses all funds received to pay wages and expenses.

(k) Since Matrix was formed in January of 1990, C. W. meets with Duffy Conley every Friday at Duffy Conley's residence. At these meetings, C.W. and Duffy Conley discuss the operation of Matrix and C.W. picks up sealed cash envelopes for the employees of Matrix.

(*l*) In approximately January of 1990, Sheila Smith's job, unlike the jobs of C.W., Reed, Ciocco and Ferrell, changed. As set

forth above, dispatching was no longer being used for service calls. Instead, Matrix was receiving the service calls directly. Sheila Smith's new role in the organization was to be the owner and operator of a new business called "Premier Enterprises." Sheila Smith is the only known employee of Premier Enterprises. The function of Premier Enterprises was and is to oversee the three vending companies referenced above, i.e., Premier Enterprises through Sheila Smith, is in charge of collections. Rick Reed has informed C.W. that he (Reed) cannot issue a monthly check to Matrix until Sheila Smith authorizes Reed to do so.

(m) In addition, Sheila Smith still occasionally talks to C.W. regarding the movement and installation of new video poker machines. Although C.W. gives Sheila Smith advice regarding new locations, Sheila Smith makes the ultimate decision regarding the installation, replacement, addition and removal of video poker machines at the various locations. When C.W. talks to Sheila Smith, he calls her at home or on her beeper. Her home telephone number is (412) 221–1579. C.W. recalls Sheila Smith using the name "Premier Enterprises" during a conversation between C.W. and Sheila Smith regarding the payment of Matrix's bills. C.W. last contacted Sheila Smith at her home phone number approximately two weeks ago regarding video poker machines. Although C.W. cannot recall exactly what was discussed during that telephone conversation, C.W. is certain that it was related to video poker machines and feels that it probably dealt with the security of certain video poker machines and/or locations.

(n) In addition to operating Premier Enterprises, Sheila Smith also owns and operates two fitness businesses. One is called E–Z shape-Up and is located in the Beechview section of Pittsburgh. The other is called "Scruples" and is located in Bridgeville. In approximately January of 1989 these two fitness establishments were opened by Sheila Smith. Both of these businesses also had video poker machines. However, only E–Z Shape–Up in Beechview still has video poker machines. C.W.

knows this because he has received call from Sheila Smith regarding problems with video poker machines at this location just as he would receive calls from any other owner of the various locations where Duffy Conley's video poker machines are located. C.W. has also personally worked on video poker machines at these locations.

(o) Sheila Smith also is currently involved in the movement of the video poker machines. Steve Killen, who is a mover employed by Matrix, is contacted directly by Sheila Smith at Matrix's location or on his beeper regarding the movement of video poker machines among the various locations.

(p) Approximately six months ago, Rick Reed (the operator of Chartiers Vending) told C.W. that he answers directly to Sheila Smith regarding Chartiers Vending's collections and disbursement of money.

Pesavento Drive affidavit, at 9–15, ¶¶ 4(h–p).

17. In addition to the information that C.W. furnished to law enforcement personnel, the Pesavento Drive affidavit, at page 15, paragraph 4(a–i) [sic], summarizes materials retrieved in a September 10, 1991 examination of garbage from the curb of 1352 Pesavento Drive, which is the address of Sheila Smith according to C.W. Examination of the garbage revealed the following papers and documents:

(a) Four "Collection's Record" documents, dated 8/12/91, 8/14/91, 8/26/91, and 8/28/91, which reflect collections from video poker machines.

(b) Scrap of paper with handwritten note "Machines in error Roma 19 Peanuts."

(c) Envelope addressed to "Three Rivers Coin" and "Attn: Sheila Smith", postmarked September 7, 1991.

(d) Envelope addressed to "Three River [sic] Coin 3105 Windgap Avenue, Pittsburgh, PA 15205", postmarked September 6, 1991.

(e) Explanation of medical benefits from Security Life Insurance Company, which contains an address of the recipient as follows:

Sheila F. Kelly
Duffy's Vending
930 Saw Mill Run Boulevard
Pittsburgh, PA 15220

(f) Two return item cash letters addressed to "Duffy's Vending 930 saw Mill Run boulevard, Pittsburgh, PA 15220–53–8" from Pittsburgh National Bank, dated 09/04/91.

(g) Scrap of form document containing the words "Records of Earnings or Payments" and "Duffy's Vending."

(h) Four other documents addressed to either Duffy's Vending or Three Rivers Coin.

(i) Several pieces of mail addressed to Sheila Kelly and Sheila Smith.

Pesavento Drive affidavit, at 15–16.

18. The Pesavento Drive affidavit avers that in July, 1990 the FBI raided several business establishments and clubs in the Western District of Pennsylvania, including Matrix, and seized over 60 video poker machines. C.W. confirmed that most of the video poker machines seized during these raids were owned by Duffy Conley and used in his illegal gambling business.

19. The Pesavento Drive affidavit avers that Special Agent Charles Duffy examined the video poker machines seized during the July, 1990 raids and determined them to be operationally equivalent to the illegal machines described by Judge Weber in *United States v. 294 Various Gambling Devices.* The only difference between the machines described by Judge Weber and the machines seized in July, 1990 was that most of the seized machines were equipped to receive $1, $5, $10 and $20 bills rather than quarters.

20. The Pesavento Drive affidavit avers that the affiant talked to Postal Inspector Barry Traynor regarding the individuals who are receiving mail at 1352 Pesavento Drive, Bridgeville, PA, 15107, which is Sheila Smith's address according to C.W. Postal Inspector Traynor, through discussions with the mail carrier who handles that address, has confirmed that a Sheila Smith and Sheila Kelly receive mail there.

21. The Pesavento Drive affidavit avers that independent investigation confirmed that Chartiers Vending is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Richard Reed.

22. The Pesavento Drive affidavit avers that independent investigation confirmed that T.D. Amusements is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Thomas D. Clocco [sic].

23. The Pesavento Drive affidavit avers that independent investigation confirmed that S & M Vending is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Phillip M. Ferrell.

24. The Pesavento Drive affidavit avers that the property located at 324 Helen Street, McKees Rocks, PA, which is the address of Matrix, is listed in the deeds registration records of Allegheny County in the name of C.W. in or about January of 1990.

25. Based upon the foregoing information, the affiant asserts that probable cause to believe that at 1352 Pesavento Drive the items listed in the *capias* clauses of the warrant will be found.

### B. Discussion

Sheila Smith contends that the Pesavento Drive affidavit failed to provide probable cause to search her residence. Further, she contends that the *capias* clauses of the warrant fail to give adequate guidance to the executing officers, thus violating the particularity requirement of the Fourth Amendment and are overly broad in relation to the probable cause in the Pesavento Drive affidavit.

The standard of review to be employed in reviewing a search warrant is clear:

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." [*Illinois v. Gates,* 462 U.S. [213] at 238, 103 S.Ct. [2317] at 2332 [76 L.Ed.2d 527 (1983)] (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a "fair probability that contraband or evidence of a crime

will be found in a particular place," id., a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found. *United States v. Conley,* 4 F.3d 1200, 1205 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994). A judicial officer is entitled to draw reasonable inferences about where evidence is likely to be found, based upon the nature of the crime and the evidence sought. *United States v. Malin,* 908 F.2d 163, 166 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). As the Court of Appeals for the Third Circuit has stated:

> While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant. Instead, probable cause can be, and often is, inferred by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property."

*United States v. Jones,* 994 F.2d 1051, 1056 (3d Cir.1993) (quoting *United States v. Jackson,* 756 F.2d 703, 705 (9th Cir.1985)).

Probable cause to believe that one has committed a crime does not establish probable cause to search that person's home, but it is not irrelevant to the inquiry. "If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Id.* at 1055–56. Likewise, it is reasonable to conclude that co-adventurers in crime, similarly situated with respect to the items sought, will keep contraband or evidence in similar places. *Id.* at 1057. Thus, in *Jones,* the Third Circuit held that the magistrate had a substantial basis for finding probable cause to search one defendant's home, after connecting him to the crime, *id.* at 1056, since his residence was close to the scene of the crime and his co-defendants' homes and probable cause to search his co-defendants' homes existed. *Id.* at 1057.

■ The Magistrate Judge had a substantial basis for crediting the hearsay informa-

tion in the Pesavento Drive affidavit. The Pesavento Drive affidavit clearly sets forth C.W.'s basis of knowledge—active participation over a long period in the crime detailed in the Pesavento Drive affidavit. Moreover, C.W.'s veracity and reliability was confirmed not only in the Fictitious Name Index and county property records, but also by the items retrieved from the garbage left at the curb of 1352 Pesavento Drive and discussions with employees of the Postal Service.

■ The Magistrate Judge had a substantial basis for concluding the Ciocco, Conley, Smith, Reed and Ferrell were conducting an illegal gambling business in violation of 18 U.S.C.1955, notwithstanding the reorganization undertaken in January, 1990. From C.W.'s account of the relationships between "new" vending companies, Matrix and Premier Enterprises, from the nature of the items retrieved in the trash search, and from C.W.'s account of his own involvement with Sheila Smith, it is certainly reasonable to infer that Sheila Smith had a supervisory role in the continuing illegal gambling business. Moreover, it is reasonable to infer that she was conducting at least some of the illegal gambling business's affairs from 1352 Pesavento Drive. Under the totality of the circumstances, the Magistrate Judge had a substantial basis for concluding that Sheila Smith's residence would contain evidence of the illegal gambling operation alleged in the Pesavento Drive affidavit.

Turning to Sheila Smith's contentions that the *capias* clauses of the warrant failed in their particularity and were overly broad in relation to the probable cause set forth in the affidavit, the Court determines that the contentions are without merit.

■ Although the bars against general warrants and warrants that exceed the scope of probable cause are both founded upon the particularity clause of the Fourth Amendment, the bars are conceptually distinct. *See generally United States v. Christine,* 687 F.2d 749 (3d Cir.1982). The *Christine* court aptly summarized the nature of a general warrant stating:

A general warrant is a warrant that authorizes "a general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The Fourth Amendment seeks to prevent general warrants by requiring all warrants to contain a "particular description" of the things to be seized. The particularity requirement "makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

*Id.* at 752–53. In contrast, an overly broad warrant limits the discretion of executing officers, but it still authorizes searching for and seizing of items for which probable cause is lacking. The *Christine* court explained:

The Fourth Amendment dictates that a magistrate may not issue a warrant authorizing a search and seizure which exceeds the ambit of the probable cause showing made to him. "(A)n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." 2 W. La-Fave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 4.6, at 97 (1978).

*Id.* at 753. Although the remedy to be applied in the case of violation of one or the other of these requirements differ, *compare id.* at 758 (fruits of general warrant should be suppressed); *with id.* at 758–59 (fruits of particularized, overbroad warrant are subject to "redaction" analysis), this Court need not reach the remedy issue. Neither requirement has been violated by this warrant and affidavit.

■ First, the *capias* clauses of the warrants are sufficiently particularized. Sheila Smith claims that clause (a) of the warrant failed to limit the discretion of the officers by failing to inform the officers how to distinguish "monies realized from the operation of video poker machines" from other monies. As the *Christine* court noted, "[T]he use of

generic classifications in a warrant is acceptable when a more precise description is not feasible." *Id.* at 760. Here, the Magistrate Judge authorized the seizure of money, which by its very nature and function is fungible. The Magistrate Judge limited the seizure as well as could be done under the circumstances, and Sheila Smith has suggested no better alternative limitation. To require more particularity in these circumstances would raise the Government's burden beyond the level of probable cause to search and seize.

■ Likewise, clause (d) authorizing seizure of "Any and all documents relating to loans and/or financial transactions between vendor and establishment" is reasonably limited under the circumstances. Clause (b), in which the terms "vendor" and "establishment" are first employed, reads in part, "contracts setting forth agreements between vendors and the establishment *for video poker machines.*" Warrant, clause (b) (emphasis added). Moreover, given its broadest interpretation, the clause remains quite limited in what it commands the officers to seize. It certainly does not convert the warrant into a general warrant.

■ Second, the clauses of the warrant which Sheila Smith contends are not supported by probable cause are so supported. She contends that clause (c) of the warrant authorized the seizure of all personal financial and banking records related to Sheila Smith and/or Sheila Kelly. That simply is not so. Clause (c) states:

(c) Any and all *business* records reflecting banking transactions, canceled checks, purchase and sales orders, invoices, shipping and receiving receipts; and invoices relating to Sheila Smith, Sheila Kelly, Duffy Conley, Duffy's Vending, Three Rivers Coin, Matrix, Premier Enterprises, T.D. Amusements, Chartiers Vending and S & M Vending from 1986 to the present.

Warrant, clause (c) (emphasis added). Given what the Pesavento Drive affidavit indicates about the nature of Sheila Smith's business dealings, including the fitness centers/gambling locations, it is fairly probable that the documents may be the instrumentalities or

contain evidence of the illegal gambling business. *Cf. Conley,* 4 F.3d at 1208.

■ Sheila Smith also contends that clause (b)'s reciting of the phrase "including but not limited to" renders the warrant unconstitutionally overbroad. This contention is actually one of a failure to particularize, not a comparison of the items to be seized and the probable cause in the affidavit. *See Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747, 750 (9th Cir.1989). The actual language of the warrant for 1352 Pesavento Drive reads, "Any and all gambling paraphernalia and records including but not limited to. . . ." Warrant, clause (b). Such language divested the officers of all discretion; the Magistrate Judge instructed them to seize *all* gambling paraphernalia and records. Such a warrant clause cannot fail for a lack of particularity. *See Christine,* 687 F.2d at 753 & n. 2.

Defendant Sheila F. Smith's Motion to Suppress [Warrant No. 91–263M] will be denied. As the Court received no proposed findings of fact and conclusions of law regarding standing of Defendant John F. "Duffy" Conley to join in this Fourth Amendment motion, his motion to join will be denied for lack of standing.[2]

2. The only Defendant who arguably moved to join this motion was Defendant Duffy Conley, although the record is not clear regarding his intent in this regard.